370

[No. 12765-9-I.   Division One.   April 7, 1986.]

NORDSTROM, INC., *Respondent,* v. G. JAMES
TAMPOURLOS, ET AL, *Appellants.*

*Robert J. Hall,* for appellants.

*Lane, Powell, Moss & Miller, John R. Tomlinson,* and *Rudy A. Englund,* for respondent.

SCHOLFIELD, C.J.—G. James Tampourlos and Lillian M. Tampourlos, husband and wife, and Gloria's Schools of Beauty, Inc., a Washington corporation, (hereinafter Tampourlos) appeal the trial court's judgment enjoining them from (1) naming their hair salon "Nostrum, The Styling Salon", (2) using the name "Phase II", (3) publicizing their salon as "formerly the Nordstrom Styling Salon", and dismissing their claim of retaliatory eviction, and awarding of attorney's fees to Nordstrom, Inc., under the Consumer Protection Act. We affirm the injunction and the dismissal and reverse the award of attorney's fees.

FACTS

In August 1970, Nordstrom and Tampourlos entered into an agreement under which Tampourlos, as licensee, would operate four beauty salons for Nordstrom, Inc. By 1981, Tampourlos was operating only one beauty salon located in the Nordstrom store in Bellevue.

Early in 1981, Nordstrom decided to discontinue the operation of a beauty salon in its Bellevue store when it moved to new quarters. Tampourlos was notified verbally of this decision in the summer of 1981 and received formal written notice of termination on September 22, 1981, giving him 4 months' notice of intent to terminate, as required by their agreement, and setting the official termination date as January 31, 1982.

On October 22, 1981, Tampourlos met with Nordstrom representatives for the purpose of arranging a smooth transition of his hairstyling salon from the Bellevue store to his new location. Tampourlos advised the Nordstrom representatives that the tentative opening date for his new salon

was November 2, 1981. He also advised them that he would continue to operate at both locations temporarily, with 50 percent of his personnel at each location.

On October 26, 1981, the Seattle Post–Intelligencer published an artist's rendition of Tampourlos' new salon, located several blocks from Bellevue Square and using the name "Nostrum" in a typeface substantially similar to that used in the Nordstrom logo. Bruce Nordstrom promptly contacted Tampourlos and objected to the "ripoff of our name". On October 29, 1981, Nordstrom filed suit against Tampourlos for unfair competition, seeking an injunction and damages.

Tampourlos did not open his salon on November 2, and on November 3, 1981, Nordstrom moved for a temporary restraining order, enjoining Tampourlos from using the name "Nostrum". The court enjoined Tampourlos from using the logo only. A few hours after that hearing, Tampourlos was notified by Nordstrom that it was terminating the operation of the beauty salon in the Bellevue store as of 6 p.m. on November 4.

On November 4, Nordstrom arranged for three men to be present in front of the beauty salon as store security. Lillian Tampourlos made an effort to get them to leave or be removed, and this request was refused. The three men did move from the front of the salon, however, into the office portion of the premises.

That same day, Tampourlos initiated action for a temporary restraining order to enjoin Nordstrom from interfering with the conduct of business at the salon. A hearing was held on November 10, and at that time the court gave Tampourlos until November 15 to vacate the Nordstrom premises. Neither party appealed from that order. Tampourlos began operation in the new store on November 5, 1981, and claims a loss of profit attributable to being required to move from the Bellevue store earlier than he had anticipated.

In January 1982, Tampourlos placed an order with Pacific Northwest Bell, which resulted in entries for "Nos-

trum, the Styling Salon" and "Nordstrom Styling Salon", both at the new address. Tampourlos claimed that the listing was an error.

Since 1974, Nordstrom had operated several smaller stores known as "Place Two" or "Nordstrom Place Two". In September 1981, Tampourlos leased a portion of his new location to a body fitness shop, which used the name "Nostrum Phase II".

At trial, Nordstrom presented lay testimony tending to show public confusion resulting from the similarity of the words "Nordstrom" and "Nostrum". Expert testimony was also admitted tending to show public confusion would likely ensue from the use of the similar name, "Nostrum".

Tampourlos presented testimony tending to show that no confusion existed regarding whether "Nostrum, The Styling Salon" was in any way associated with Nordstrom.

In finding of fact 11, the trial court found use of the names "Nostrum" and "Phase II" in connection with Tampourlos' new salon "tends to and does deceive or mislead persons of ordinary caution into the belief that they are dealing with one concern when in fact they are dealing with the other." The court enjoined Tampourlos from using either of those names or from publicizing his salon as "formerly the Nordstrom Styling Salon". The court further found that the defendants breached their contract with Nordstrom through the trade name infringement and related activities and did not exercise good faith toward Nordstrom, thereby justifying Nordstrom's immediate termination of their relationship. The trial court also found that Tampourlos' conduct violated the Consumer Protection Act and awarded Nordstrom judgment for $25,000 in attorney's fees.

### USE OF "NOSTRUM" AND "PHASE II" AS UNFAIR COMPETITION

"Nordstrom" is a family name used for many years by the plaintiff in a consistent form as a logo identifying a growing number of successful shoe and apparel stores over

the western United States. As such, the trade name "Nordstrom" has acquired a secondary meaning, which is entitled to protection from unauthorized use. *Seattle St. Ry. & Mun. Employees Relief Ass'n v. Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees*, 3 Wn.2d 520, 531, 101 P.2d 338 (1940); *Evergreen State Amusement Co. v. S.F. Burns & Co.*, 2 Wn. App. 416, 419, 468 P.2d 460 (1970).

▉ The issue with respect to Tampourlos' use of "Nostrum" and "Phase II" is whether these names so resemble "Nordstrom" in appearance or sound as to deceive or mislead persons of ordinary caution into believing they are dealing with one concern when they are actually dealing with another. *Seattle St. Ry. & Mun. Employees Relief Ass'n*, at 533. The likelihood the public will be deceived is the critical question. Whether a name has acquired a secondary meaning and whether the public is likely to be deceived are questions of fact to be determined on a case–by–case basis. *Olympia Brewing Co. v. Northwest Brewing Co.*, 178 Wash. 533, 538, 35 P.2d 104 (1934); *Evergreen State Amusement Co. v. S.F. Burns & Co., supra* at 422–23.

The trial court made findings of fact that the plaintiff had established a secondary meaning for its trade names "Nordstrom" and "Place Two" and also found as a fact that the defendant's use of the names "Nostrum" and "Phase II" in connection with his hairstyling business tended to and did deceive the public. The evidence before the court clearly supports those findings. Tampourlos commenced using the name "Nostrum" in a form and style similar to the use of "Nordstrom" by plaintiff. It is also apparent that "Nostrum" has a sound sufficiently similar to "Nordstrom" to result in confusion and deception in the public mind. Tampourlos' selection of the word "Nostrum" has no apparent justification other than the likelihood that it would permit him to benefit from the secondary meaning developed by the name "Nordstrom" over the years.

▉ Tampourlos argues that he is not in competition with Nordstrom, since he does not sell shoes or apparel,

and therefore his use of "Nostrum" could not be unfair competition. Proof of monetary damage or direct business competition is not a necessary prerequisite to injunctive relief in an unfair competition case. *Evergreen State Amusement Co.*, at 420; *Cartier, Inc. v. Three Sheaves Co.*, 465 F. Supp. 123 (S.D.N.Y. 1979). In any event, the evidence shows that Nordstrom had operated hairstyling salons in connection with its apparel stores in the Seattle area and was continuing to operate a hairstyling salon in connection with the store in Seattle. There was evidence of sufficient competition to answer this contention by Tampourlos. The trial court's order enjoining Tampourlos from the use of "Nostrum" and "Phase II" must be affirmed. *Thorndike v. Hesperian Orchards, Inc.*, 53 Wn.2d 570, 343 P.2d 183 (1959).

### TAMPOURLOS' BREACH OF CONTRACT CLAIM

Tampourlos contends that Nordstrom's attempted 24–hour termination of the license agreement was a breach of the agreement, entitling him to recovery of damages. Nordstrom argues that its attempted immediate termination of Tampourlos' operations was justified by Tampourlos' trade name infringement, which constituted a breach of contract. Nordstrom relies upon paragraph 9 of the agreement, which provides in part:

> In general, Licensee agrees to conduct said operations subject to the approval of and in a manner agreeable to the officers of Nordstrom.

While Nordstrom attempted a 24–hour termination of the license agreement by giving Tampourlos notice on November 3 that his operation in the Bellevue store was terminated as of 6 p.m. on November 4, that attempt was ineffective. Tampourlos did not move out, but instead sought a temporary restraining order which was heard on November 10. At that time, the court gave Tampourlos until November 15 to vacate the premises. He did so, and neither party appealed the order. That order thus became final and binding on both parties. Tampourlos is not enti-

tled to damages on a theory of being compelled to vacate earlier than he had planned because the ruling of the court on November 10 became the law of the case and established November 15 as the vacation/termination date. It is, therefore, immaterial to the issues before us whether Nordstrom's attempted 24–hour termination was lawful or unlawful.

## Consumer Protection Act

The trial court concluded the Consumer Protection Act applied and awarded Nordstrom, as the prevailing party, $25,000 as reasonable attorney's fees and costs of suit in the amount of $2,357.83. Tampourlos contends the Consumer Protection Act does not apply and that the attorney's fee award is excessive and therefore unreasonable.

RCW 19.86.020 provides:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

RCW 19.86.090 provides in part:

Any person who is injured in his business or property by a violation of RCW 19.86.020 . . . may bring a civil action in the superior court to enjoin further violations, to recover the actual damages sustained by him, or both, together with the costs of the suit, including a reasonable attorney's fee, . . .

Nordstrom relies upon *Tradewell Stores, Inc. v. T.B. & M., Inc.,* 7 Wn. App. 424, 500 P.2d 1290 (1972), which holds that wrongful appropriation of another's trade name is an unfair and deceptive practice in violation of RCW 19.86-.020, requiring an award of attorney's fees under RCW 19.86.090. We find this case unpersuasive at this time. The opinion does not address the requirement that the "public interest" be impacted before the protection and remedies of the Consumer Protection Act can be applied. This requirement was made a part of our law by *Lightfoot v. Mac-Donald,* 86 Wn.2d 331, 544 P.2d 88 (1976) 4 years after *Tradewell* was decided. While the cases are not completely consistent, it is clear that a substantial public interest fac-

tor must be present in order for the Consumer Protection Act to apply. *See* Comment, *Private Suits Under Washington's Consumer Protection Act: The Public Interest Requirement*, 54 Wash. L. Rev. 795 (1979).

In *Anhold v. Daniels*, 94 Wn.2d 40, 614 P.2d 184 (1980), the court stated at page 45:

We reiterate that in order for a private individual to bring an action under RCW 19.86, the conduct complained of must: (1) be unfair or deceptive; (2) be within the sphere of trade or commerce; and (3) impact the public interest.

The court then continued at page 46:

We believe the presence of public interest is demonstrated when the proof establishes that (1) the defendant by unfair or deceptive acts or practices in the conduct of trade or commerce has induced the plaintiff to act or refrain from acting; (2) the plaintiff suffers damages brought about by such action or failure to act; and (3) the defendant's deceptive acts or practices have the potential for repetition.

The facts in this case do not meet the requirements for showing the presence of a public interest as set out in *Anhold.* Nothing Tampourlos did in this case operated as an inducement to Nordstrom to do anything other than file a lawsuit to protect its own interest. The inducement requirement relates to consumers generally being influenced by unfair or deceptive practices such as misleading advertising. *Eastlake Constr. Co. v. Hess*, 102 Wn.2d 30, 50, 686 P.2d 465 (1984). That element is not present here. The thrust of this litigation is a private dispute between two parties over trade name infringement. We do not have here a risk of harm to the public generally, the elimination of which is the primary goal of the Consumer Protection Act. *Eastlake Constr. Co. v. Hess, supra; Lightfoot v. MacDonald, supra; Washington Consumer Protection Act—Public Interest and the Private Litigant*, 60 Wash. L. Rev. 201 (1984).

While there is evidence here that the public could confuse "Nostrum" with "Nordstrom", there is no evidence of

harm or damage to the public, which is required to trigger remedies under the Consumer Protection Act.

Nordstrom did not prove monetary damages in this case and none were awarded by the trial court.

Using the name "Nostrum" would continue until enjoined. Thus, there is a potential for repetition, but this is not significant once we conclude that the public interest is not impacted.

Nordstrom argues that once unfair competition is established, that alone is sufficient to trigger Consumer Protection Act remedies, whether or not the public interest is impacted. We find no authority to support this argument. Nordstrom cites *Money Savers Pharmacy, Inc. v. Koffler Stores (Western) Ltd.,* 37 Wn. App. 602, 682 P.2d 960 (1984). The *Money Savers* opinion, however, states just the opposite at pages 610–11:

> Since the purpose of the Consumer Protection Act is to protect the public interest, *Lightfoot v. MacDonald,* 86 Wn.2d 331, 334, 544 P.2d 88 (1976), a necessary element of an unfair competition claim brought under RCW 19.86 is that the defendant's conduct is "injurious to the public interest", *Brown v. Safeway Stores, Inc.,* 94 Wn.2d 359, 373–74, 617 P.2d 704 (1980).

We conclude the trial court erred in applying the Consumer Protection Act. The award of attorney's fees and costs of suit to Nordstrom is reversed.

OTHER ISSUES

Tampourlos assigns error to the trial court judgment enjoining defendants from publicizing themselves as "formerly the Nordstrom Styling Salon". While this could be a viable issue for the first few months following Tampourlos' commencement of operations in a new location, it is now over 4 years since that occurred. Under these circumstances, we deem the issue moot and do not address it further.

Tampourlos also assigns error to the trial court's dismissal of defendant's counterclaims and third party claims.

However, this assignment is not argued in the brief, and we deem it abandoned.

CONCLUSION

The award of attorney's fees and costs under the Consumer Protection Act is reversed. The trial court judgment in all other respects is affirmed.

There being no clearly prevailing party on appeal, each party will bear its own costs.

SWANSON and COLEMAN, JJ., concur.

Review granted by Supreme Court June 3, 1986.